UNITED STATES v. NEWPORT NEWS SHIPBUILDING & DRY DOCK CO.

(Circuit Court of Appeals, Fourth Circuit. February 12, 1910.)

No. 837.

1. UNITED STATES (§ 70*)—CONSTRUCTION OF CONTRACTS.

The rule that a contract is to be construed most strongly against the party who prepares it applies to the United States with respect to its contracts with private parties.

[Ed. Note.—For other cases, see United States, Cent. Dig. § 53; Dec. Dig. § 70.*]

2. UNITED STATES (§ 70*)—CONSTRUCTION AND OPERATION OF CONTRACTS—EXTRA EXPENSES.

Plaintiff built for the United States the armored cruiser Charleston, of 9,700 tons displacement, under a contract prepared in the Navy Department requiring the vessel to "be subjected to a trial trip in the open sea, under the conditions prescribed or approved by the Secretary of the Navy, to test the hull and fittings * * * and the speed of the vessel." Plaintiff had previously built a number of vessels for the department under similar contracts, and in each case the trial trip had been made around stake boats in the open sea, and up to the time of this contract the government had never tested any vessel of over 3,225 tons by the standardization method, and in each of the few cases where such test had been made it was by agreement with the contractor. When the Charleston was completed, the Secretary telegraphed plaintiff to know if a certain standardizing course would be acceptable for the trial, to which plaintiff answered that it did not understand the contract to require such test, but offered to have it made if the extra expense was paid by the government. No reply was made to such letter, but the Secretary ordered the test made, and also required the usual trial at sea, both of which the vessel passed successfully. The extra expenses of the standardization test were considerable. *Held*, that the contract required but a single test, and must be construed in the light of the previous practice of the department on which plaintiff had a right to rely in making its bid; also, that the Secretary, by ordering the standardization test after being notified of plaintiff's construction of the contract, and without objecting thereto, impliedly accepted such construction, and bound the government to pay the additional expense of such test.

[Ed. Note.—For other cases, see United States, Dec. Dig. § 70.*]

In Error to the Circuit Court of the United States for the Eastern District of Virginia, at Norfolk.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Action by the Newport News Shipbuilding & Dry Dock Company against the United States. Judgment for plaintiff, and defendant brings error. Affirmed.

This is a writ of error to a judgment of the Circuit Court of the United States for the Eastern District of Virginia, in a suit brought under Act March 3, 1887, c. 359, 24 Stat. 505 (U. S. Comp. St. 1901, p. 752), commonly known as the "Tucker Act," wherein the Newport News Shipbuilding & Dry Dock Company (defendant in error) was plaintiff, and the United States (plaintiff in error) was defendant. The judgment was for $4,999.54, the amount claimed at the trial by the plaintiff corporation, and costs.

The court below made the following findings of facts after hearing the evidence offered by the parties:

"I. The claimant herein is a corporation incorporated under the laws of the state of Virginia, with its principal office, yards, and plant located at the city of Newport News, Virginia, where said company carries on the shipbuilding business.

"II. That beginning with the year 1894, the said claimant has been building large vessels for the United States government, having built 11 such vessels between that time and the 30th day of March, 1901.

"III. That the provisions with respect to trial trips in the case of said 11 vessels, including the phrase 'under conditions prescribed by the Secretary of the Navy' (Record, p. 25) are substantially the same as those in the contract for the Charleston hereafter referred to (a copy of which is exhibited with the petition), with the exception of three gunboats, whose trials were not required to be run in the open sea, and all of the said vessels, so far as speed trials were concerned, were subjected to four-hour runs over courses measured by the government, and all upon the open sea, with the exception of three gunboats, buoys being used to determine the length of the course, and stake boats, consisting of available government vessels being stationed along the course. On these stake boats, as well as upon the vessel undergoing trial, were stationed a corps of observers employed by the government. The speed of the vessel undergoing trial was determined by the measured course, subject to a correction based upon the observation of the tidal observers stationed on the stake boats. The government defrayed all expenses of stationing the stake boats, measuring and laying out of the course, and providing for the observation. (Record, pp. 5, 6, 25, and 26.)

"The claimant ran all its previous trials by this method, and in no instance was more than one day required for the speed trials and all other trials provided in the contract. (Record, p. 112.)

"Eight stake boats would have been required for the Charleston's trial by the above method. (Record, p. 7.) According to the practice at the time of the contract, the speed trial was not to be by standardization method, and no estimate was made therefor. (Record. pp. 10, 11.)

"IV. That after 1890, and prior to the date of the Charleston contract, no ship anywhere built for the United States of more than 1,000 tons displacement had been tried by the standardization method.

"V. That during the period between 1890 and the date of the Charleston contract only thirteen (13) vessels, with a total aggregate displacement of 6,635 tons, were tried by the standardization method, and, in all such cases of trial, the same was had either upon the application, or with the consent of, the contractor; whereas, during the same period, thirty-three (33) vessels, with a total aggregate displacement of 149,696 tons, were tried by the method of having speed trials over a measured course.

"VI. The cost of standardizing large ships is very much greater than in the case of small ships and involves greater times. (See Record. page 30.)

"VII. That it has been customary in trials previously run by the claimant for the Navy Department to lay down conditions for the trial, but these conditions have been confined to matters of detail connected with the actual handling of the ship and her machinery at the actual time of trial. (See Record, p. 68.)

"VIII. That on the 30th day of March, 1901, the claimant entered into contract with the United States, through its Secretary of the Navy, whereby the

claimant agreed to construct and complete the armored cruiser, Charleston, with 9,700 tons trial displacement, and when completed, as required by the drawings, plans, and specifications, and ready for delivery to the Government, the claimant agreed that the said vessel should 'be subjected to a trial trip in the open sea, under the conditions prescribed or approved by the Secretary of the Navy, to test the hull and fittings, machinery, including engines, boilers and appurtenances, the equipment and installation of the ordnance and ordnance outfit and the speed of the vessel,' and the claimant guaranteed 'that the speed developed by the vessel upon said trial, under conditions prescribed or approved by the Secretary of the Navy, shall be not less than an average of twenty-two (22) knots an hour, maintained for four consecutive hours.'

"The above agreement was made in consideration of two millions, seven hundred and four thousand dollars, and in consideration of certain other sums to be paid the claimant in the event of changes in the plans and specifications or alterations in the contract itself, which might be made by the United States pursuant to the rights in the contract reserved, a copy of which said contract was annexed to claimant's petition as a part thereof, and the same is made a part accordingly thereof, and introduced in the evidence in this case and in the words and figures following:

"IX. That the standardization trial is not such a trial on the open sea as is referred to in the provisions of the contract relating to sea trial.

"X. That the plans and specifications, as distinguished from the contract, which by the said contract are made part thereof, contain nothing relating in any way to the said trial trip, or the conditions under which it was to be run.

"XI. That at the time of the completion of the vessel and when she was ready for trial on the 14th day of June, 1905, the Secretary of the Navy telegraphed to the claimant, asking if the Rockland course for standardizing the Charleston was not ready on the 28th, whether the Provincetown course of 25 fathoms would be acceptable, to which telegram the claimant responded both by telegram and letter, that according to its construction of the Charleston contract the trial was to be the same as in its other previous vessels under similarly worded contracts, and the claimant further stated that considerable extra expense would be involved in the standardization trial, but that, if the department insisted upon the change, the claimant would undergo the standardization trials, and would submit an estimate of increased cost; that the complainant would prefer to have more than 25 fathoms of water to make the standardization trial if such trial was to be had. (See telegram and letter exhibits. See Record, pp. 7, 8.)

"That no answer was made by the department to these communications, and on the 15th day of June, 1905, the Secretary of the Navy, by order in writing, required the claimant to run the standardization trials, notwithstanding the contractor's protest against the deviation from the previous practice. (See Record, p. 9.)

"That under this order of the Secretary of the Navy the claimant proceeded to Provincetown, and successfully ran her standardization trials on the 28th day of June, 1905, covering at varying speeds about 100 miles (Record, p. 14), and running at her maximum speed about two hours (Record, p. 16), the running of which, with consequent work on engines and boilers, to restore them and the displacement of the ship (see Record, p. 15) to requisite condition for the four-hour run of the following day (Record, p. 31), consumed a day of twenty-four hours. That the said day wherein the standardization trials were run was a day suitable in every way for the making of the four-hour run required by the contract, and but for the running of the standardization trial on that day, the four-hour run, and all the other trials required by the contract, might have been run (Record, p. 13). On the following day the contractor successfully ran the four-hour trial in the open sea, and the said Charleston was thereafter in due course accepted by the government.

"That deep water is essential for the running of a speed trial, and that since the trial of the Charleston it has developed that the Provincetown course is one-tenth of a knot slower than the Rockland course, where deeper water is had. (See Record, pp. 12, 13.)

"That by reason of the requirement of the running of the standardization trials the claimant was put to the additional expense the just and reasonable items of labor and materials amount to the sum of $4,999.54, and that the said sum represents the necessary cost to the claimant of the running of the said standardization trials, the items of which are as follows, here insert:

"Trial Trip 41 Charleston.

"Consumable Stores (Direct Bills).

| | |
|---|---:|
| 1¢ Toilet paper | $ 7 15 |
| 100 lbs. Calcium | 8 00 |
| 4,600 cigars | 192 75 |
| Liquors | 91 60 |
| L. Water | 50 00 |
| Service of Captain | 250 00 |
| 29,600 lbs. of ice | 46 00 |
| Drugs | 12 70 |
| Bread | 60 70 |
| Soap & Whiting | 6 85 |
| Groceries | 2,864 49 |
| Coffee & Tea | 81 45 |
| Milk & Butter | 145 05 |
| Liquors | 153 55 |
| 250 Cigars | 32 50 |
| Table water and G. Ale | 19 55 |
| Beer | 140 75 |
| Oysters, 10 Gals | 12 00 |
| Laundry work | 2 60 |
| "      " | 126 82 |
| Supplies (W. A. P.) | 118 00 |
| "Total | $4,422 51 |

"U. S. S. Charleston, Dr., to Newport News Shipbuilding & Dry Dock Company.

"Labor and Material Chargeable Account of Standardization Trial.

| | | |
|---|---:|---:|
| "To amount expended for labor during (7) days trial trip.......... $13,381 67 | | |
| 1/7 of above | $1,911 66 | |
| Time of men who went especially on account of standardization method | 99 06 | |
| | | $2,010 72 |
| 40% expense account | | 804 29 |
| Amount of coal burned from 7 a. m. June 28th to 7 a. m., June 29th, 1905, 100 tons $2.70 | 270 00 | |
| 10% expense account | 27 00 | |
| | | 297 00 |
| Putting aboard 100 tons loose coal @ 40c | 40 00 | |
| 40% expense account | 16 00 | |
| | | 56 00 |
| Amount of oil used from 7 a. m. June 28th to 7 a. m. June 29th, 1905, 750 gals. @ 35c | 262 50 | |
| Direct Bills......... $4,422 51 | | |
| 1/7 of above | 631 78 | |
| Miscellaneous stores less credits....... 1,313 42 | | |
| 1/7 of above | 187 63 | |
| | | 1,081 91 |
| 10% on material | | 108 19 |
| 1 days tug service | | 75 00 |
| Job Order #9926 | | 537 98 |
| "      " #9927 | | 28 45 |
| | | $4,999 54 |

"XII. In running a standardization trial, ranges are put upon shore distant at Provincetown from the course on which the vessel was run, about two and one-half miles. These ranges consist of 4x6 scantlings, one of which is set near the shore and the other a half mile further inland. Another similar set of timbers is placed a mile from the first. (Record, p. 79.) Stake boats and buoys are placed along the course to be traversed by the vessel simply as guides to keep the vessel in the channel. One mile from either end of the mile course buoys are placed in order that those in charge of the vessel may know when they are coming on the range. (Record, p. 97.) Five runs are made over the course at high speed, followed by nine runs at various speeds. (Record, p. 97.) The vessel gets on a line with the mile standardization course at the first buoy, which is placed a mile from the end of the course, the time is taken when the first two ranges come in line and the counting of the revolutions of the screw begins, the time is again taken at the other end of the course, when the other two ranges come in line, at this time the counting of the revolutions ceases. The vessel then proceeds in a long loop so as to permit her heading in the opposite direction to the course traversed to enter upon the line of the course at the buoy one mile distant therefrom, from which point she proceeds until the ranges again come into line, proceeding as before. This is done for every run the vessel is required to make. (Record, p. 14.) The runs are made at varying speed, constituting what is called 'progressive speed trial' (see North Carolina and Montana contracts); from such runs a curve of speed and revolutions are plotted, which curve shows the number of revolutions required for any given speed.

"XIII. That the process of standardization is a speed trial (see Record, pp. 103, 104) of a distinct character (Record, p. 26).

"Under the method of trial by stake boats and buoy, the means of measurement is provided and paid for by the government, and the sole function of the contractor is one of performance. By the standardization method, a large part of the means of measurement is provided and paid for by the contractor, who still remains under the burden of performance, thus resulting in a great saving to the government at the cost of the contractor.

"During the period from 1890 to 1905 it was the practice of the government to standarize its vessels after receiving the vessel from the contractor by trials run by it for such purpose.

"XIV. That up to the date of the Charleston's trial in June, 1905, no ship anywhere built for the United States of greater tonnage than 3,253 tons trial displacement had been tried by the standardization method, and no vessel had been tried by the standardization method up until that time except on the application or with the consent of the contractor.

"During the period between the date of the Charleston contract° and the Charleston's trial, eight (8) vessels, with an aggregate tonnage of 103,772 tons were tried by the older method of stake boat and buoy. (See list filed with Eberle's evidence.)

"XV. That the claimant ran the trials of the monitor Arkansas by the standardization method in 1902, but did so for its own convenience, and because of the low freeboard of the vessel, informing the Secretary of the Navy at the time it agreed to do so that the contract made no provision therefor, to which claim of the contractor the Secretary made no reply. (Record, pp. 33, 51, 52.)

"XVI. That the standardization of a large vessel involves much more time and cost than in the case of a small vessel.

"XVII. That by circular of the 7th of November, 1903, the Secretary of the Navy called for bids on two 13,000-ton battleships—the Mississippi and Idaho. By the provisions of the circular, and the provisions in the contract, these vessels were, under conditions prescribed or approved by the Secretary of the Navy, to be subjected to 'a speed trial of four hours' duration over a measured course' (Record, p. 37); no provisions for standardization being made therein.

"XVIII. That by circular approved September 8, 1904, calling for bids on two 14,500-ton armored cruisers—the North Carolina and Montana (Record,

pp. 37 and 38)—by appropriate provisions it was provided with respect to trial, that the vessels 'shall be subjected to trial trips, in the open sea, under conditions prescribed or approved by the Secretary of the Navy, to test the hull and fittings, machinery, including engines, boilers and appurtenances, the installation of the ordnance and the ordnance outfit, and the speed of the vessel, and that she shall be accepted only on fulfillment of, and subject to, the conditions and agreements hereinafter set forth:

" '(1) That the working of the machinery in all its parts shall be to the satisfaction of the Secretary of the Navy.

" '(2) That the vessel shall be subjected to a speed trial of four hours' duration over a measured course, and the party of the first part hereby guarantees that the speed developed by the vessel upon the said trial, under conditions prescribed or approved by the Secretary of the Navy, shall be not less than an average of twenty-two (22) knots an hour, during which period the air pressure in the fireroom shall not exceed an average of two (2) inches of water, the vessel to be weighted to a mean draft of twenty-five feet; to a progressive speed trial consisting of about twelve runs over a measured mile course at varying speeds, in which the actual speed and horse power on each run shall be accurately determined; to an endurance trial, under all boilers, of twenty-four hours' consecutive duration in the open sea, at an average of not less than two-thirds of the average horse power actually developed on a successful speed trial of four hours' duration as above required, on which the speed and horse power shall be accurately determined, and the total coal used during the trials shall be carefully tallied and recorded.'

"XIX. That on the 21st day of July, 1905, the claimant presented to the Secretary of the Navy his claim for increased compensation on account of the change in the contract requiring such standardization trials, and claiming that the running of such trials was a deviation from the practice prevailing at the time of the execution of the contract.

"The Secretary of the Navy in effect admitted that the running of such trials was not customary at the time of the execution of the contract, but claimed that he had the right to order the same under the provisions of the contract providing that the Secretary of the Navy was authorized to prescribe the conditions under which the trial provided for in the contract was to be run, against which ruling the contractor protested, and this action results therefrom.

"XX. That the standardization method has been adopted by Great Britain and Germany in testing their naval vessels, and is generally believed by marine engineers of the present day to be the best method of testing the speed and endurance of such ships, both large and small. A trial by that method, in so far as the open sea part thereof is concerned, is more accurate in its results, can be made under conditions under which a trial under the old method would be impossible or impracticable, as where the sea is rough, or the weather is bad, and is not more expensive to the contractor, except in the loss of time and the increased costs incidental thereto, including, among other things, such expenses as are herein allowed incurred on account of the standardization trials made in this instance, than a trial by the old method.

"XXI. That fourteen naval vessels built by private contractors for the United States were tried by the standardization method, by order of the Secretary of the Navy, prior to the 30th of March, 1901, the date of the Charleston contract, said vessels having been constructed under contracts which, as to the matter of trials, were substantially the same as the Charleston contract. The names of these vessels with the dates of the contracts and of the trials, respectively, are stated in the answer of the government in this case, the trial of the first (that of the Bancroft) having been made January 21–23, 1893. And twelve other such vessels, which had been contracted for prior to the date of the Charleston contract, were tried by that method within two years after that date, and before the trial of the Charleston, the names of which vessels with the dates of the contracts and of the trials, respectively, are also stated in the answer. The names of the vessels referred to in this finding, with the tonnage of each, and the date of the respective trials, are as follows:

| Name of Vessel. | Tonnage. | Date of Trial. |
|---|---|---|
| Bancroft | 839 | January 21-23, 1893. |
| Detroit | 2089 | April 10, 1893. |
| Newport | 1000 | May 27, 1897. |
| Vicksburg | 1000 | May 29, 1897. |
| Marietta | 1000 | May 25, 1897. |
| Wheeling | 1000 | May 28, 1898. |
| Farragut | 279 | October 28, 1898. |
| Dahlgren | 146 | October 23-24, 1899. |
| T. A. M. Craven | 146 | December 16, 1899. |
| Mackenzie | 65 | November 29, 1898. |
| Bailey | 280 | December 18, 1900. |
| Thornton | 200 | March 26-29, 1901. |
| Stockton | 200 | November 16 and 19, 1900. |
| Perry | 480 | February 25, 1901. |
| Shubrick | 200 | April 2, 1901. |
| Bagley | 175 | May 15, 1901. |
| Barney | 175 | May 9, 1901. |
| Biddle | 175 | July 2, 1901. |
| Blakely | 196 | September 28, 1901. |
| De Long | 196 | November 9, 1901. |
| Decatur | 420 | December 10, 1901. |
| Bainbridge | 420 | January 13, 1902. |
| Arkansas | 3225 | August 6, 1902. |
| Wyoming | 3225 | October 28, 1902. |
| Preble | 420 | May 27, 1902. |
| Paul Jones | 420 | July 8, 1902. |

—and the trials of all of said fourteen vessels by the standardization method were had either upon the request or with the consent of the contractor.

"XVII. That the Newport News Shipbuilding & Dry Dock Company is the only person owning or interested in the claim above set forth, and no assignment or transfer of the same or any part thereof or interest therein has been made.

"That the claimant has made due demand upon the government for the payment of the amount of money sued for; that neither the said sum, nor any part thereof has been paid.

"That the claimant has always borne true allegiance to the government of the United States, and has not in any way aided, abetted, or given encouragement to rebellion against it; and that the case made by the claimant is within the jurisdiction of the Circuit Court of the United States for the Eastern District of Virginia, at Norfolk."

L. L. Lewis, U. S. Atty.

R. G. Bickford, for defendant in error.

Before GOFF and PRITCHARD, Circuit Judges, and BOYD, District Judge.

PRITCHARD, Circuit Judge (after stating the facts as above). The findings of fact and conclusions of law by the learned judge who tried this case below clearly present the points involved in this controversy. The findings of fact are supported by the evidence, and we are therefore not inclined to interfere with the same. The rule that a contract is to be construed most strongly against the party preparing it is well settled, and applies to the government in a case like this as well as to an individual. In the case of Garrison v. United States, 7 Wall. 688, 19 L. Ed. 277, the court, among other things, said:

"The supplementary agreement is signed by Gen. Butler and not by the plaintiff. Its doubtful expression should, therefore, according to the well-settled rule, be construed against the party who uses the language."

The facts in this case show that the contract was prepared in the Navy Department, and we are justified in assuming that it was drafted by a law officer of that department. The parties to it, as appears from the findings of fact, had, prior to the date of this contract, entered into similar contracts, and under those contracts the speed trial was not under the standardization method, and the plaintiff below, in making its estimates, at the time it entered into this contract, did not include the same. It is true that between 1890 and the date of the trial of the Charleston it had been customary to run such trials, but the court below found that in every instance such trials were run by the government at its own expense and after the government had accepted the vessel.

To construe this contract in conformity with the contention of counsel for plaintiff in error would be to hold that it contemplates that contractors, under its provisions, shall make two trials. The contract, which is plain and explicit, provides that only one trial shall be made. It says:

"When the vessel is completed as required by the drawings, plans and specifications and ready for delivery to the party of the second part, she shall be subjected to a trial trip in the open sea under such conditions prescribed or approved by the Secretary of the Navy to test the hull and fittings * * * and the speed of the vessel."

Thus it will be seen that the contract provides for "a trial trip," which necessarily means only one trip, and which clearly shows that it was in the minds of the contracting parties at the time that only one trial trip should be made.

It clearly appears that the government, as well as the contractor, understood that the ancient method of trial was to be the one by which the Charleston was to be tested. Thus it was to be a trial of speed and endurance which was to be obtained during the four consecutive hours of its duration. The minds of the parties met in the construction of the contract in this respect. That the government understood that standardization was not contemplated by the contract is apparent from all the facts and circumstances surrounding the transaction. It had uniformly adhered to its policy of requiring trials by the ancient method, until the Charleston's trial. Until that time, no ship constructed for the government of more than 3,250 tons displacement had been tried by the standardization method, nor until that period had any such trial been required of any contractor, in the absence of a request for such trial or an assent thereto. It is significant that on the 7th day of November, 1903, bids on two 13,000-ton battleships were accepted, and in those instances the contractual provisions were similar to the Charleston, no provision for standardization being made. However, on the 8th day of September, 1904, bids were called for on two 14,500-ton armored cruisers (the North Carolina and Montana), and special provision was made for a speed trial of four hours' duration on a measured course "under conditions prescribed or approved by

the Secretary of the Navy, and also a standardization trial," thus clearly showing that it was the intention of the Secretary of the Navy that, in order to exact the standardization test in addition to the speed trial, it was necessary specifically to provide for the same.

Notwithstanding the facts as we have stated them, when the Charleston was completed and ready for trial, the Secretary of the Navy informed the contractor that he desired the trial to be by standardization. The contractor, instead of complying with the request made by the Secretary of the Navy, immediately informed him that he understood that the Charleston contract only contemplated a trial by the ancient method, and that to require an additional trial, such as standardization, would result in additional expense, and insisted that the department should not deviate from its previous practice. However, the contractor stated that, "if the Department insists upon the change, we will accept the Provincetown course, and will submit estimates of the increased cost." To this communication it appears that no reply was made by the Secretary of the Navy until the 15th day of June, 1905, at which time the contractor was ordered to proceed with the standardization trial, and the contractor thereupon complied with the request, incurring the additional expense, for which the judgment was rendered by the court below. Thus it will be seen that at the time the contractor was requested to make the additional trial the Secretary of the Navy was informed that if this trial was made it would be regarded as a change for which estimates had not been made, and that increased costs for the same would be submitted. By the terms of the statement made by the contractor at that time, the Secretary of the Navy knew that it was the purpose of the contractor to proceed under the interpretation which he had placed upon the contract, and his order to proceed with the standardization trial, under such circumstances, was in the nature of an acceptance of such interpretation. In the case of Central Pacific Railway Company v. United States, 28 Ct. Cl. 427, in referring to this question, it is said:

"A construction given to a contract by the express declaration of one party, and the silent acquiescence of the other prior to or during the service of the performance, cannot be repudiated after the party has acted upon the faith of it."

Assuming that the changed clause of the contract does not apply to an alteration of the duties of the contractor thereunder, nevertheless, if the Secretary of the Navy, in the exercise of the inherent power vested in him by virtue of his office, and the statutes relating to the same, actually exercised such power by modifying, extending, or enlarging the contract, such action on his part necessarily involves an obligation to pay any sums that may have been expended in making such modification. In the case of United States v. Corliss S. E. Co., 91 U. S. 322, 323 (23 L. Ed. 397), the court said:

"The duty of the Secretary of the Navy, by the act of April 30, 1798, creating the Navy Department, extends, under the orders of the President, to 'the procurement of naval stores and materials, and the construction, armament, equipment, and employment of vessels of war, as well as all other matters connected with the naval establishment of the United States.' 1 Stat. 553 [c. 35]. The power of the President in such cases is, of course, limited by the leg-

islation of Congress. The legislation existing, the discharge of the duty devolving upon the Secretary necessarily requires him to enter into numerous contracts for the public service; and the power to suspend work contracted for, whether in the construction, armament, or equipment of vessels of war, when from any cause the public interest requires such suspension, must necessarily rest with him. As, in making the original contracts, he must agree upon the compensation to be made for their entire performance, it would seem that, when those contracts are suspended by him, he must be equally authorized to agree upon the compensation for their partial performance. Contracts for the armament and equipment of vessels of war may, and generally do, require numerous modifications in the progress of the work, where that work requires years for its completion. With the improvements constantly made in shipbuilding and steam machinery and in arms, some parts originally contracted for may have to be abandoned, and other parts substituted; and it would be of serious detriment to the public service if the power of the head of the Navy Department did not extend to providing for all such possible contingencies by modifications or suspension of the contracts, and settlement with the contractors."

It would be manifestly unjust to hold that the Secretary of the Navy could exercise the power to make modifications in the provisions of the contract and suspend the same if needs be, and yet not have the power to obligate the government for the payment of any additional cost that might be incurred in making such alterations and modifications. This would be contrary to all rules of construction and not at all in harmony with the well-settled law of the land.

In construing this contract we should treat it just the same as though it were a contract between individuals rather than an individual and the government as in this instance. The Supreme Court of the United States, in referring to this question in Smoot's Case, 15 Wall., at page 47 (21 L. Ed. 107), said:

"In approaching the inquiry into the effect which the action of the bureau of cavalry, in adopting these new rules for inspection, had upon the rights of the parties to this contract, let us endeavor to free ourselves from the consideration that the government was one party to the contract, and that it was for a large number of horses; for we hold it to be clear that the principles which must govern the inquiry are the same as if the contract were between individuals, and the number of horses one or a dozen instead of four thousand."

It is insisted that the previous practice of the government cannot influence the construction of this contract. In the case of United States v. McDaniel, 7 Pet. 14 (8 L. Ed. 587), the court said:

" * * * A practical knowledge of the action of any one of the great departments of the government must convince every person that the head of a department, in the distribution of its duties and responsibilities, is often compelled to exercise his discretion. He is limited in the exercise of his powers by the law; but it does not follow, that he must show statutory authority for everything he does. No government could be administered on such principles. To attempt to regulate, by law, the minute movements of every part of the complicated machinery of government, would evince a most unpardonable ignorance on the subject. Whilst the great outlines of its movements may be marked out, and limitations imposed on the exercise of its powers, there are numberless things which must be done that can neither be anticipated nor defined, and which are essential to the proper action of the government. Hence, of necessity, usages have been established in every department of the government, which have become a kind of common law, and regulate the rights and duties of those who act within their respective limits. And no change of such usages can have a retrospective effect, but must be limited to the future. Usages cannot alter the law, but it is evidence of the construction given to it, and must be considered binding on past transactions."

In this case it appears, as we have already said, that prior to the trial of the Charleston, the universal custom had been only to require "a trial," and that the trial by standardization had not, prior to that time, been required of any contractor in the absence of an agreement on his part to make such trial. Therefore, we have what might be termed a long series of transactions between the government and its contractors in which contracts similar to the one involved in this controversy were construed to mean that the vessels constructed were to be subjected to only one trial. The case of United States v. Alabama Railroad Company, 142 U. S. 621, 12 Sup. Ct. 306 (35 L. Ed. 1134), is very much in point. The court in that case, among other things, said:

"We think the contemporaneous construction thus given by the executive department of the government, and continued for nine years through six different administrations of that department—a construction which, though inconsistent with the literalism of the act, certainly consorts with the equities of the case —should be considered as decisive in this suit. It is settled doctrine of this court that, in case of ambiguity, the judicial department will lean in favor of a construction given to a statute by the department charged with the execution of such statute, and, if such construction be acted upon for a number of years, will look with disfavor upon any sudden change, whereby parties who have contracted with the government upon the faith of such construction may be prejudiced. It is especially objectionable that a construction of a statute favorable to the individual citizen should be changed in such manner as to become retroactive, and to require from him the repayment of moneys to which he had supposed himself entitled, and upon the expectation of which he had made his contracts with the government. These principles were announced as early as 1827 in Edwards' Lessee v. Darby, 12 Wheat. 206, 210 [6 L. Ed. 603], and have been steadily adhered to in subsequent decisions. United States v. Bank of North Carolina, 6 Pet. 29, 39 [8 L. Ed. 308]; United States v. McDaniel, 7 Pet. 1 [8 L. Ed. 587]; Brown v. United States, 113 U. S. 568 [5 Sup. Ct. 648, 28 L. Ed. 1079]; United States v. Moore, 95 U. S. 760, 763 [24 L. Ed. 588]."

It is insisted by counsel for the government that the meaning of this contract is to be determined solely by the language of the contract itself, and that it provides no specific method of trial. We cannot give our assent to this proposition in view of the facts and circumstances surrounding the transaction. Here the contractor had, for a number of years, been engaged in constructing vessels for the government, and during that period had been required to make only one test. Therefore, in preparing estimates with a view of bidding for the contract to construct the Charleston, he only based such estimates upon the requirements that had been exacted by the government prior thereto. Thus, in order to properly construe a contract of this character, it becomes highly important to ascertain the nature of the requirements for the construction of similar vessels prior to the time this contract was entered into. In the case of Merriam v. United States, 107 U. S. 441 [2 Sup. Ct. 536, 27 L. Ed. 531], the court said:

"It is a fundamental rule that in the construction of contracts the courts may look not only to the language employed, but to the subject-matter and the surrounding circumstances, and may avail themselves of the light which the parties possessed when the contract was made. Nash v. Towne, 5 Wall. 689 [18 L. Ed. 527]; Barreda v. Silsbee, 21 How. 146, 161 [16 L. Ed. 86]; Shore v. Wilson, 9 Cl. & Fin. 355, 555; McDonald v. Longbottom, 1 El. & El. 977; Mun-

ford v. Gething. 29 L. J. C. P. 110: Carr v. Montefiore, 5 B. & S. 407; Brawley v. U. S., 96 U. S. 168 [24 L. Ed. 622]."

In this instance the contract was entered into in the light of the circumstances attending the execution of contracts of this character, in view of which the contractor had every reason to believe that it would not be required to do more than had been required of it by former contracts between it and the government, as well as respects contracts of similar character that had been entered into between the government and other contractors for like service.

We have carefully considered the cases relied upon by counsel for the government, and the contention with respect to the same, but we do not think the principles announced therein apply to the case at bar.

The fact that this contract provides that the vessel shall be subjected to "a trial trip upon the open sea," considered in connection with the further fact that only one trial trip had been required prior theretofore, impels us to the conclusion that the construction placed upon the same by the learned judge who heard the case below is correct. Therefore the judgment of the lower court is affirmed.