## SCULLY v. UNITED STATES.

(District Court, D. Nevada. April 27, 1912.)

No. 1,017.

1. PUBLIC LANDS (§ 24*) — SURVEYS — METHODS — SUFFICIENCY — CONTRACT WITH DEPUTY SURVEYOR.

Surveys of public lands made by plaintiff as a deputy surveyor under a contract with the United States *held* to have been correctly executed in the field on evidence showing that they were approved by the field examiner appointed by the Surveyor General for the state as authorized by Rev. St. § 2223 (U. S. Comp. St. 1901, p. 1362), and where, as shown by the plats, they did not differ from subsequent surveys made by others employed for the purpose by the government which were approved, although plaintiff's plats had been rejected.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 31, 32; Dec. Dig. § 24.*]

2. CONTRACTS (§ 289*)—CONDITIONS PRECEDENT TO RECOVERY—DECISION OF ARBITER.

While the decision of an arbiter to whom the question of the performance of a contract is committed by its terms is binding on the parties, in the absence of fraud, mistake, or negligence so great as to be equivalent to bad faith, it is not necessary that there should be actual fraud or intentional wrong to entitle the contractor to maintain an action to recover for his work notwithstanding the refusal of the arbiter to approve the same. but it is enough if such refusal was arbitrary, unreasonable, or unjust.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. § 1310; Dec. Dig. § 289.*]

3. PUBLIC LANDS (§ 24*)—SURVEYS—EXECUTION OF CONTRACT.

The Commissioner of the General Land Office is so far a representative of the government in respect to contracts for surveys of public lands as to be to all intents and purposes a party to the contract and bound by its terms as fully as the contractor, and, where his approval of the work is made necessary by the contract before the contractor is entitled to payment, he, as well as the Surveyor General under whose direct supervision the work is done, is bound to exercise the utmost good faith, and cannot refuse to approve the work because the contractor stopped before completing the survey of all the land embraced in the contract, where he was advised to do so by the Surveyor General

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

on the ground that the cost of the work already done reached the estimated amount of the contract.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 31, 32; Dec. Dig. § 24.*]

**4. PUBLIC LANDS (§ 24*)—SURVEYS—EXECUTION OF CONTRACT.**

The Commissioner of the General Land Office *held* not justified in refusing to approve a survey of public land made by a deputy surveyor under a contract because of resurveys and retracements of prior lines made without the express authority required by the contract and the manual of instructions made a part thereof, or because of the manner in which the field notes were kept, where the manual expressly made it the duty of the Surveyor General to give specific instructions as to such matters on request, and the surveyor repeatedly asked for such instructions, and where, although both the Commissioner and the Surveyor General were kept at all times advised of the work he was doing and the arrangement of the field notes, no objection was made thereto until all had been completed.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 31, 32; Dec. Dig. § 24.*]

**5. CONTRACTS (§ 147*)—CONSTRUCTION—UNDERSTANDING OF PARTIES.**

When there is a doubt as to the meaning of a contract, a party will be held to that meaning which he knew the other party supposed the words to bear during the performance of the contract.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 730, 743; Dec. Dig. § 147.*]

**6. UNITED STATES (§ 70*)—CONTRACTS—CONSTRUCTION.**

The rule that a contract is to be construed most strongly against the party preparing it applies to the government with respect to a contract for the survey of public land.

[Ed. Note.—For other cases, see United States, Cent. Dig. § 53; Dec. Dig. § 70.*]

**7. UNITED STATES (§ 110*)—DEFAULT IN PAYMENT UNDER CONTRACT—INTEREST.**

Interest cannot be allowed on a claim against the United States arising under a contract, unless provided for by the contract or by statute.

[Ed. Note.—For other cases, see United States, Cent. Dig. § 93; Dec. Dig. § 110.*]

At Law. Action by Dennis Scully against the United States. Judgment for plaintiff.

See, also, 193 Fed. 185.

This action was brought to recover $9,932.85, of which $5,189.85 is alleged to be due on contract for surveying certain public lands in central Nevada, and the remainder, $4,743, is claimed for loss of time and interest. The contract is dated September 26, 1900. It was made by Dennis Scully, the plaintiff, acting for himself, and the United States Surveyor General for Nevada, acting in behalf of the United States. It provided that Scully in his own proper person should survey, mark, and establish "all lines necessary to fully complete the survey of township No. 14 N., range No. 41 E., townships 17 and 18 N., range No. 43 E., townships 17, 18 and 19 N., range No. 44 E., and township No. 18 N., range 45 E., Mount Diablo Meridian"; that all should be done "in strict conformity with the laws of the United States, the printed Manual of Surveying Instructions as revised and approved June 30, 1894, and other surveying instructions issued by the Commissioner of the General Land Office, and with such special instructions as he may receive from the said Surveyor General in conformity therewith (all of said instructions to be taken and deemed a part of this contract)." The estimated liability was fixed at $3,000. The compensation was fixed

"by the Treasury Department of the United States, as a full compensation for all work performed under this agreement, at the rate of nine (9) dollars for base, standard, meridian, and meander lines, seven (7) dollars for township lines, and five (5) dollars for section and connecting lines, except where the lines of survey pass over mountainous lands, or lands heavily timbered, or covered with dense undergrowth, and in such case at the rate of thirteen (13) dollars for base, standard, meridian and meander lines, eleven (11) dollars for township lines, and seven (7) dollars for section and connecting lines, per mile, for every mile and part of a mile actually run and marked in the field, random lines and offsets not included."

It was required that the surveys should be completed and true field notes thereof returned to the office of said Surveyor General on or before September 1, 1901, on penalty of forfeiture and payment to the United States of the sum of $6,000 (secured by bond), in case Scully failed to perform the contract according to its terms. This time was later extended. Further stipulations of the contract were as follows: "No payment shall be made until the plats and field notes of the survey executed under this contract shall have been accepted by the Commissioner of the General Land Office. * * * No accounts shall be paid unless properly certified by the Surveyor General (or his successor in office) that the surveys are in accordance with the instructions herein referred to and the provisions of this agreement, and until approved plats and certified transcripts of field notes of the surveys for which the accounts are rendered are filed in the General Land Office. * * * The said surveys will not be approved by the said Surveyor General, * * * unless they shall be found to be in exact accordance with the instructions hereinbefore specified."

The Manual of 1894. referred to in the contract, and made a part thereof, contains full and minute directions relative to surveys. These directions must be observed by Surveyors General, their assistants, and deputy surveyors. On page 65 of the Manual, the following rule is set out: "Special Instructions Issued by United States Surveyors General to United States Deputy Surveyors. One of the most important duties to be performed by the Surveyor General is to provide the deputy surveyor with *special instructions*, in connection with the contract, prepared in accordance with law, which instructions will not consist of directing attention to certain paragraphs in this Manual, reiteration of its requirements, and printed directions of a *general* nature; but they will in all cases be *specific* in character, with all necessary *detailed statements* setting forth *what* the deputy is to do and *how* the work is to be performed. Before making out special instructions, the Surveyor General will cause a thorough examination to be made of the field notes and plats of older surveys of standard and township lines upon which the deputy is to base his work, and give him *full* information—both *written* and *graphic*—of the exact condition of adjoining surveys, with all *irregularities* that may be found, carefully and clearly noted; with all necessary instructions for his guidance if he finds everything *as it should be*, and, in addition, full advice as far as practicable what to do in case the surveys on the ground are *not as represented* in the old notes. If the contract includes exterior lines, the Surveyor General will specify in detail *where* the deputy is to commence, in what *order* and in what *direction* he is to run the lines, and provide for his use a *diagram*, drawn to a scale of one inch to one mile, giving full and accurate information in regard to lengths and bearings of all lines of old surveys, *from* which he is to work, or *upon* which he is to close. The diagrams will be made triplicate, one copy for the General Land Office, one for the deputy, and one to be retained; they may be either original drawings, or blueprints or tracings therefrom. *In no case must the deputy be sent into the field without full and accurate information in regard to all irregularities on the records which will affect the extent or accuracy of his survey.*"

Pursuant to this rule, the Surveyor General, October 3, 1900, sent Mr. Scully some 10 pages of instructions, copies of which are attached to the answer. Among these instructions was the following: "Should any of the corners of the old survey from which you are required to start, or upon which you are required to close, have become obliterated, you are authorized

to retrace so much of the old lines as may be necessary to re-establish such corners, but you will retrace only such lines as are absolutely necessary for that purpose. Where any of the old corners with which you connect have become partially destroyed or are in bad condition, you will properly restore such corners, describing in your field notes the corner as found, and as restored. I append a copy of circular letter of date June 15th, 1888, regulating the compensation for such retracements." Prior to the actual survey. Mr. Scully, with a full corps of assistants, at his own expense, made a preliminary recognizance to ascertain the actual condition of boundaries and corners which were to be the starting or closing points of his work, so that he might obtain beforehand needed instructions. In a letter dated March 5, 1901, to the Surveyor General, he reported these conditions. The Surveyor General acknowledged receipt of this letter March 8th, thanked Scully for his "information as to the condition of the monuments of former surveys in the territory covered by your contract, No. 225," and said: "This will be of value hereafter as showing the necessity of such retracements and resurveys as you will have to make."

On March 31, 1901, Scully communicated with the Surveyor General, detailing conditions in township 19 N., range 44 E., township 18 N., range 45 E., township 17 N., range 44 E., and township 18 N., range 43 E., and again asked instructions as to resurveys and retracements. The Surveyor General, April 4, 1901, replied in part, as follows: "The question of retracement of exterior lines sufficiently to establish a reliable point of beginning for the work under your contract is fully covered in your instructions of October 3, 1900, and the circular letter of June 15, 1898, of the General Land Office thereto appended, and in the Surveyors' Manual of 1894, page 72. * * * At all events, sufficient showing has been made to justify the resurvey of the entire township boundaries (Tp. 18 N., R. 45 E.) and entitle you to compensation for doing so. * * * It is impossible to give further instructions even upon the showing you make. All you can do is to go ahead in good faith with your contract, exercising the best of your judgment and being guided by the Manual. I shall take pleasure in doing all that I can to see that you are properly compensated to the full extent of the terms of your contract. The accuracy and care with which your previous contracts have been executed establish an excellent standing for you in the General Land Office at Washington."

April 27, 1900, Scully informed the Surveyor General of the conditions in township 17 N., range 44 E., and township 17 N., range 45 E. He described the absence of monuments, the irregularity in measurements, and the unreliability of the field notes of the old surveys. Inasmuch as he was obliged to connect with interior corners of township 17 N., range 44 E., and "as after long search no interior corners could be found for three miles on any range of sections," he "simply had to resubdivide." He described his methods of subdivision, and concluded thus: "It is evident that all fractional subdivided townships will have to be resubdivided when I have any notes whatever. I am not anxious to do such additional work, which is much more tedious and annoying than new work, besides the question of payment; but it is even more necessary for the country than the work of the contract, and in any case I do not see under the rules how I am to avoid it. You see the rules themselves have to be extended and modified to make them applicable. * * * I know you appreciate the situation, and believe the department will do justice as it appears to them; but the labor and worry cannot be overestimated. For five weeks preparing for subdivision, and still much to be done at W. side of Toyabe. When I complete preparation, then I can estimate quite closely additional cash necessary. * * * Hoping to hear from you about this resubdivision business." In the last letter Scully asks instruction three times, and points out the fact that he has already spent five weeks in preparatory work, and much more remains to be done before he can commence on the new survey. He shows that the cost will exceed the estimated liability.

June 4, 1901, Scully writes the Surveyor General, telling him how he proposes to subdivide townships, unless otherwise instructed. He describes the bad conditions of the old survey of certain boundary lines, tells how he is

dealing with these conditions, and closes thus: "Needless to say, I greatly dislike the responsibility, but hope it is all right. I should greatly wish to get instructions or suggestions about the subdivided portion of T. 19 R. 44 referred to in a recent letter. The survey is most difficult. Those double sets of monuments on so many lines cost a great deal, and I may remark that the ratio of 5 to 7 is far less than the true ratio of the cost of section lines on the level to the cost of such lines on the mountain." These details and request for instruction are authorized by the Manual, p. 80, in the following rule: "It is possible, however, that cases may arise so complex in their character as to produce a feeling of doubt relative to the proper solution of the problem, in which case he will at once communicate with this office through the Surveyor General, submitting information, by letter and diagrams, of the exact condition as found by him, and the necessary instructions will be forwarded as soon as practicable." The only reply received by Mr. Scully, so far as the evidence shows, is the following letter from the Surveyor General's office, dated June 7, 1901: "Your favor of 4th inst. is received. I fully appreciate the difficulties which you are encountering, but your course is clearly pointed out in circular of June 15, 1898, from the General Land Office, Washington, D. C. which was attached to and made part of the Instructions dated October 3, 1900, given you for the execution of your contract No. 226. I shall do all in my power to endeavor to see that you are properly compensated for the conscientious work you are doing, and must leave the details of executing your difficult task entirely to your own professional skill and judgment under the orders already furnished." In response to a request that his time for completing the contract be extended to December 31, 1901, the Surveyor General replied, July 13th, stating that he would be pleased to recommend such extension, and added: "I trust that you are pushing the work with the indomitable energy displayed in similar emergencies, and have no doubt that full compensation will be awarded you for the extra care and trouble bestowed upon your arduous work."

October 2, 1901, the Commissioner of the Land Office, in a letter to the Surveyor General, acknowledged receipt of Mr. Scully's application for an extension of time, and called attention to the work performed by Mr. Scully in excess of the contract. The language used by the Commissioner is as follows: "Your attention is invited to the concluding paragraph of Deputy Scully's letter relative to an excess of liability of $800 over and above the estimated liability of his contract. Any action looking to the issue of special instructions providing for resurveys or retracements must be taken and approved prior to December 31, 1901, the extended date of said contract." There is no evidence that any such action was ever taken, or that the Surveyor General ever asked the Commissioner to authorize the resurveys and retracements reported to him by Mr. Scully. October 1, 1901, Mr. Scully wrote the following letter to the Surveyor General: "I beg leave, respectfully, to inform you that I have just completed the Reese River side of the survey under contract No. 225, and return to-day to·the other or Smoky Valley side of the mountains to complete the contract if authority therefor be given. My notification that the cost would considerably exceed the estimate has not yet been replied to, and there is moreover an amount to be added to my estimate then given which requires a new notification. T. 14 R. 41 was found in a worse condition as regards monuments than any other in my contract inasmuch as its S. boundary for four miles at least was completely destitute of monuments or their traces, while the irregularity of distance etc. of monuments in the interior, their irregular marking and other causes made it impossible without a complete resurvey of two-thirds of the township to initiate new work. This alone will add some $300 to my former estimate. Also in that estimate Tship. boundaries having double sets of monuments were supposed charged for with the distances between the sets added for each corner. This is certainly irregular as closing distances alone for just one cor. are provided for and as the additional work must be intended to be paid for I have concluded that the Department will pay for the boundary of each T. ship independently which in these cases makes a double rate when they coincide which is none too much for such work. On this supposition, the total cost of completing the survey would be $4,500. I need

not point out how my initiative work will expedite all future surveys in this district. There are still a mountain township and more than half another to be done on the contract Ts. 17 and 18, R. 44, and these may not be completed before December. Now I have already expended nearly the estimate in cash, and as the money is borrowed, I am extremely uneasy at the prospect of expending more without authority. I have however decided to keep at work until I hear from you and I request in the most urgent manner that you will advise me by return what to do until the decision of the G. L. O. in the matter is obtained. Working for nothing at the most arduous work mentally and physically that earth can show is bad enough but getting in debt in a serious manner on it is by far worse. I earnestly request that you will present my statement to the Hon. Commissioner and that you will advise me with as little delay as possible in the meantime what to do."

October 3, 1901, the Surveyor General in reply advised Mr. Scully, inasmuch as the estimated amount of the contract had been reached, without the survey of townships 17 and 18 N., range 44 E., he would be justified in leaving those townships unsurveyed. The material portion of the letter is as follows: "Your favor of 1st inst. is received, reporting condition of affairs under your contract No. 225. I had hoped that having obtained the extension of the time for completing the field work and returns that you would have reported by this time your contract ready for inspection. In prior letters I have repeatedly assured you of my hearty co-operation to obtain the fullest compensation for the additional work involved in retracement of old lines imperfectly surveyed and inadequately marked, but can do nothing more until the returns are before me, it being the well established policy of the General Land Office not to render decisions in hypothetical cases. If you find that the estimated amount of your contract has been reached without the survey of townships 17 and 18 N., R. 44 E., the instructions are explicit and you will be justified in leaving those townships unsurveyed. It is beyond my power to sanction or authorize anything not expressly provided for in the instructions, the circular of June 15, 1898, attached to and made part of your contract being considered ample authority to sustain any claim you may submit for extra work." After the receipt of the last letter Mr. Scully continued his work until he had subdivided all lands occupied, or likely to be occupied, by settlers in said townships, and then in the belief this was all which could be required of him under the contract he closed his work in the field.

December 24, 1901, Mr. Scully forwarded to the Surveyor General maps of township 17 N., range 44 E., and township 18 N., range 45 E., with field notes of retracements and resurveys thereof, accompanied by a letter, of which the following paragraph only is material: "I thought the best course would be to give the field notes of resurveys by townships consecutively paged to the end of the resurveys, beginning with preliminary oaths covering the whole of the resurveys and ending with the final oaths covering the whole; as I should suppose it cannot be the intention that assistants should be sworn on entering and leaving every township. The field notes of new surveys I have given in the same manner." The letter and the field notes exhibited Mr. Scully's methods. Field notes of the interior or section lines were included with notes of exterior boundary lines of each township in one book. The field notes of resurveys and retracements of each township were written in a book by themselves, and not in the same book with field notes of new surveys in the same township. The Manual of 1894, p. 179, contains the following direction: "Field notes of retracements and resurveys will be incorporated with the field notes of the subdivisions to which they are directly related."

Instructions issued by the Commissioner of the Land Office June 15, 1898, are that field "notes of resurveys and retracements * * * will be incorporated in a book by themselves." The general subject of field notes is treated in the Manual of 1894, beginning at page 60. The first 11 numbered paragraphs are clearly for the guidance of the deputy surveyor, who actually makes the survey. Paragraph 12 requires the deputy to transmit his original notes to the Surveyor General. They become a part of the permanent records, "and no changes whatever will be permitted in said original field notes

after they have been filed in the Surveyor General's office." Paragraph 13 reads, in part, as follows: "(13) The *original field notes*, each bearing the *written approval* of the Surveyor General, will be substantially bound in volumes of suitable size and retained in the Surveyor General's office. *Certified transcripts* of said *original field notes* will be prepared at the earliest practicable date, as follows: (a) The field notes of the survey of base lines and standard parallels, of principal and guide meridians, of township exteriors, and of subdivision and meander lines will be written in *separate books*. A *complete set* of preliminary and final oaths will be attached to the field notes of *each class of lines*. No adhesive material of any kind will be used to fasten leaves or covers. Cut or mutilated leaves, or slips, will not be inserted. (b) The field notes of *subdivisions* will be written in *a separate book for each township;* the preliminary oaths of the assistants employed in making said subdivisions will be prefixed to the *first* book, and their final oaths will be attached to the *last* book of the series, arranged in the order of dates."

Mr. Scully was engaged about two months longer in the preparation of the notes and plats. There is no evidence that the Land Office on receipt of the letter directing attention to Mr. Scully's methods made any objection to his arrangement, or offered any suggestion or instruction in relation thereto, until May 1, 1902, though objection was made January 7, 1902, to the plats because they did not give full fence lines within the survey. May 1, 1902, the Surveyor General refused to approve the field notes in the condition they were, alleging that Scully had failed to comply with the provisions of paragraph 1, p. 60, and also paragraph 13, p. 64, of the Manual, "as to the manner of dividing the field notes into separate books each containing one class of lines run only." He also said the sketch plats were vague, and, in instances, unintelligible, and added: "This, however, would be a matter easy to remedy, did not more serious departures from your special instructions and the directions of the Manual lay your entire work open to rejection or suspension by the field examiner who may be sent to inspect your work. The amount of work done as resurveys is far in excess of any authorization, and the failure to fully subdivide a township, as distinctly specified in your contract, is such a violation of both the language and spirit of the contract itself, as well as the established policy of the General Land Office, as to preclude the possibility of my approving your work or of its being accepted by the honorable Commissioner should it be approved at this office, even if it should happen to pass the scrutiny of the examiner in the field." In this letter the Surveyor General rejected 158½ miles of resurveys made by Scully, including 18 miles of township boundary of township 18 N., range 45 E., mentioned in the letter of April 4, 1901, supra. Scully replied to these charges June 13th in a letter of 56 pages, and appealed to the Commissioner of the General Land Office. In September and October, 1902, George O. Chaney, special agent for the examination of surveys, examined Mr. Scully's work in the field. October 16th Chaney returned his field notes, with the following recommendation: "The surveys under this contract appear to have been well executed, and the corners perpetuated by permanent monuments. I recommend the work be accepted. George O. Chaney, Examiner of Surveys."

November 29, 1902, the Surveyor General again wrote Scully, saying it was impossible to continue office work on his field notes and sketch plats, further consideration of them being merely a waste of time, and, if he would come to Reno, every facility would be extended him for putting the notes and sketches into such shape that they could be properly worked up, and receive the approval of the office. This letter contained no allusion to alleged defects in the survey. The deputy was notified of his right to appeal. Scully's original plats and field notes were sent to Washington January 14, 1903, and on May 12, 1903, were returned by the Commissioner to the Surveyor General, with this instruction: "The above plats and field notes have been examined; also the voluminous correspondence in connection with Deputy Scully's contentions regarding this contract. It would appear that Deputy Scully bases his main contention in this case on having all of his retracements and resurveys platted and acknowledged by you, whether or not you approve of same as being necessary for the proper survey of this contract. You will exercise your own discretion in this matter but prepare the plats

and field notes of this contract for transmission to this office in the usual manner. In regard to field notes of retracements and resurveys, I would call your attention to page 156, specimen field notes, No. 4 of the Manual of 1902." Accordingly, the Surveyor General September 26, 1903, certified that Mr. Scully's field notes of surveys and resurveys under contract No. 225, "having been critically examined, the necessary corrections and explanations made, the said field notes and the surveys they describe are hereby approved." In relation to this approval, the Commissioner of the Land Office in his letter to the Surveyor General, dated January 17, 1905, at page 57, says: "The foregoing letter should not be construed as approving the contention of Deputy Scully in any respect or to disapprove of the position taken by your office in respect to the surveys and field notes of the deputy, but it was only intended to get the returns before this office in better shape for thorough examination, and your office was not authorized, much less directed, to approve of the survey and field notes." The Surveyor General testified his certificate was made as a matter of form to complete the record, and was of no weight unless the notes and surveys were approved by the Commissioner.

July 8, 1903, the Commissioner ordered the surveys under contract No. 225 suspended, and allowed Scully 30 days in which "to show cause why he should not be required to place the same in condition for acceptance, and prepare his field notes in proper form."

The alleged defects in Scully's work on which this order was based, in brief, were as follows:

(1) "The west boundary and the southwest corner of township 19 N., range 44 E., was not properly established." The corner should be 117 links east of where Scully placed it.

(2) The corner to townships 18 and 19 N., ranges 44 and 45 E., was not properly established.

(3) In retracing west boundary of previously subdivided portion of township 19 N., range 44 E., Scully in several cases moved old corners from 25 to 40 links from their original position.

(4) Township 19 N., range 44 E., was not properly subdivided.

(5) Like errors to these appear through the entire survey.

(6) The deputy resurveyed many miles which his own records show were unnecessary.

(7) He failed to complete the surveys contemplated.

(8) The field notes contain much unnecessary matter, and omit matter of the first importance.

(9) The deputy's methods are irregular and obscure, his notes confusing, poorly prepared, and unfit for record. They should be so prepared that they may be readily understood by persons of average intelligence.

January 17, 1905, the Commissioner rendered the decision which is now a part of the answer in this case. In this latter decision "the particular lines and corners rejected by said decision (of July 8, 1904) were accepted." but more than 100 errors "were pointed out in other parts of the survey." (Dec. of the Secty. of the Interior, Ex. 8, p. 3.)

The Surveyor General was directed to notify Scully that suspension of his surveys was affirmed, and to allow him "30 days in which to signify his willingness to correct his surveys in the field, and furnish field notes in proper form for acceptance." July 31, 1905, this last decision of the Commissioner was sustained by the Secretary of the Interior. In his decision the Secretary calls attention to faulty construction of field notes, excessive resurveys, the necessity of reforming the notes, of eliminating excessive resurveys therefrom, of resurveying certain lines, and re-establishing corners which the deputy did not properly place. December 5, 1905, Mr. Scully notified the Land Department that he absolutely refused to "attempt any compliance with the orders contained in office letter of January 17, 1905." In explanation of this refusal, and of his failure to accept the Surveyor General's invitation to come to Reno, Mr. Scully testifies: "I did not think I could do the work in the way he wanted. The work I was asked to do was wrong. I doubted Mr. Kyle, and I didn't want to go near him. I didn't think he would give me a square deal. I did not believe I could make a survey which would suit them."

In 1909 the townships which were the subject of Mr. Scully's contract No.

225 were surveyed by Messrs. Thurtell and Kearney, Deputy United States Surveyors. Copies of their plats are in evidence.

Dennis Scully, in pro per.
Samuel Platt, U. S. Atty.

FARRINGTON, District Judge (after stating the facts as above). The pleadings are exceedingly voluminous. The complaint contains more than 33,000 words, and the answer more than 19,000. In the complaint there is an effort to state the facts which constitute the cause of action, the evidence, the argument, and a history of the entire transaction, including several appeals and other proceedings in the Department of the Interior.

The answer admits the execution of the contract on which the action is based, and by way of denial to the allegations of the complaint sets out a 54-page letter written by the Commissioner of the General Land Office more than three years before the action was commenced. The pleadings are not so helpful as could be wished. They present no clear statement of the issues. The plaintiff was required by his contract to complete the survey of eight townships, and to prepare plats and field notes of this work. The estimated cost was $3,000. When his account amounted to more than $5,100, he had still some 30 sections to survey. He now demands compensation for the partial performance of his contract. Defendant in its answer takes the position that plaintiff is entitled to nothing because the surveys were defective and incomplete, the notes confusing, improperly arranged, unintelligible, and unfit for record, and the plats not in accordance with the rules of the Manual. Taking the entire transaction as shown by pleadings and evidence, I have endeavored to determine the rights of the parties without strict construction of the pleadings.

## The Survey.

[1] It is urged that the approval of "the field examiner is immaterial to the issues of this case. The contract did not require his approval or that of any other subordinate officer," and "the United States is not liable for the acts of its agents unless manifestly done within the scope of their authority."

This objection is without merit. Section 2223, Rev. St. U. S. (U. S. Comp. St. 1901, p. 1362), authorizes the Surveyor General "to depute a confidential agent to make such examination," and in the Commissioner's circular letter of June 15, 1898, which is made a part of the contract, it is said:

"These retracements must be corroborated by the examiner before the deputy will be allowed compensation, and retracements thus made, as well as surveys, will be noted in the data furnished by Surveyors General to the examiners when starting for the field inspection, and the latter will be required to examine each mile or portion of a mile of such retracements in order to verify the work done by the deputy for which he asks compensation."

Thus the examiner is required to inspect each mile of retracement, and proper data therefor must be furnished by the Surveyor General. The Surveyor General and the Commissioner rejected 158½ miles of

resurveys and retracements after the examiner recommended "the work be accepted."

It is alleged in the complaint, and not denied, and it is shown by the official report of Mr. Chaney, that in the discharge of his official duty with a corps of assistants he examined Mr. Scully's surveys, and found them properly executed. The Surveyor General himself testifies that Scully's surveys were reasonably well executed, and that no complaint is made except to the field notes. Furthermore, the townships which Mr. Scully contracted to survey were again surveyed in 1909 by two deputy surveyors employed by defendant for that purpose. Copies of their plats, approved by the Surveyor General, are in evidence. No attempt has been made to show this approval was a mere matter of form, and my attention has not been called to any difference between Scully's rejected plats and the approved plats of Messrs. Thurtell and Kearney, save that the former exhibit a larger number of resurveyed lines, and the latter show some 30 sections in townships 17 and 18 N., range 44 E., which were not surveyed by Scully. Neither Chaney, Thurtell, nor Kearney are here to explain or contradict the very strong inference from these circumstances. I must therefore find that Mr. Scully's surveys under said contract No. 225 were correctly executed in the field.

### Finality of Commissioner's Decision.

[2] Defendant contends that the Commissioner's decision in this controversy is not open to review by the courts, because:

"The contract provides that no payment shall be made until the plats and field notes are accepted by the Commissioner of the General Land Office, and that the Surveyor General shall certify that the services were made in accordance with the provisions of the contract. These requirements obviously mean that the Commissioner is made the arbiter of the sufficiency of the plats and field notes, and whether the surveyor has complied with the obligations of the contract. Where by contract there is committed to a designated officer the matter of deciding questions of dispute, the decision of the officer so designated is not open to review by the courts, except for fraud or such gross error as would imply bad faith."

Plaintiff's argument that the Commissioner's approval is unnecessary is based upon that portion of section 456 of the Rev. Stats. of the U. S. (U. S. Comp. St. 1901, p. 258), which was repealed in 1894 (Act July 31, 1894, c. 174, 28 Stat. 207). It would be unreasonable to require payment for services like those performed by Mr. Scully before the government has had opportunity to accept or reject the performance. Authority to accept or reject must be lodged somewhere. The parties here very properly vested this authority in the Surveyor General and the Commissioner of the Land Office. If the Commissioner has thus been made the arbiter of the sufficiency of the work, it follows that his decision is binding, unless it is shown to be fraudulent, or the result of mistake or negligence, so great as to be equivalent to bad faith. United States v. Gleason, 175 U. S. 588, 607, 20 Sup. Ct. 228, 44 L. Ed. 284. It is not necessary that there should be actual fraud or intentional wrong. It is enough if there has been an arbitrary, unreasonable, or unjust refusal to accept work which

ought to be accepted. Edwards v. Hartshorn, 72 Kan. 19, 82 Pac. 520, 1 L. R. A. (N. S.) 1050; Highton v. Dessau.. (Com. Pl.) 19 N. Y. Supp. 395. In the latter case the contractor and the arbiter disagreed as to the meaning of the contract. The court held the work required by the arbiter was not required by the contract, and permitted a recovery without the architect's certificate. In Kistler v. The Indianapolis, etc., R. R. Co., 88 Ind. 460, 464, it was held that where the arbiter had failed to estimate work, or by mistake had underestimated it, suit could be maintained for recovery of the correct amount.

[3] We must not lose sight of the fact that the Commissioner is the representative of the government in this transaction, having the execution of the contract and the performance of the survey thereunder so completely in his charge through his subordinates, including the Surveyor General, as to be, to all intents and purposes, one of the parties to the agreement itself. Under the circumstances, it is incumbent upon the Commissioner and the Surveyor General to exercise a high degree of care and good faith. They are not above the contract. They are bound by its terms, and they have no right of arbitrary rejection. They have no right as a condition precedent to require performance of work which is not required by the contract itself. Furthermore, when the government entered into this contract, it consented to its terms, and is bound thereby. The Commissioner has no authority, under the guise of instruction, or otherwise, to relieve the government and the officers of the Land Department from the obligations of the contract, to the injury of Mr. Scully.

[4] On page 65 of the Manual, under the heading "Special Instructions Issued by United States Surveyors General to United States Deputy Surveyors," it is declared to be one of the most important duties of the Surveyor General to provide the deputy surveyor with special instructions. These instructions must be specific, with such details as to show the deputy what he is to do, and how the work is to be performed. He is to be furnished "with all necessary instructions for his guidance if he finds everything as it should be, and, in addition, full advice as far as practicable what to do in case the surveys on the ground are not as represented in the old notes." At page 80 of the Manual, we find that, when the deputy is confronted by a situation so complex that he is in doubt as to the proper solution, he is directed to report exact information to the Land Office, "and the necessary instructions will be forwarded as soon as practicable." On page 224, it is said if it becomes—

"absolutely necessary to resurvey and retrace any portion of the exterior township lines, except such as are clearly provided for in the article on pages 72, 73, and 74, the deputy should report the facts immediately to the Surveyor General and await further instructions. The facts as reported to him will be promptly laid before the Commissioner of the General Land Office, specifying the number of miles of retracement required, and, if such resurvey is authorized, the deputy will be immediately notified. In no other case will any resurvey be paid for which is not specifically authorized by the Commissioner."

These provisions of the Manual were a part of the contract. Under them Mr. Scully had a right to expect such instructions as he needed,

provided he made the proper application. Furthermore, it is not enough that the instructions would be sufficient for the Surveyor General if he were executing the survey himself, but they must be sufficient for the guidance of the particular deputy to whom they are issued. No other construction is possible.

. My attention has been called to no provision of the contract, or of the Manual, which gives any countenance to the idea that the Land Office is at liberty to refuse or neglect to furnish instructions when demanded by the deputy in the field, or during the progress of his work, or that the Commissioner and the Surveyor General can postpone their replies anywhere from two months to three years after the deputy has concluded the contract, and then condemn work because he was unable to guess correctly what their ex post facto instructions might be. Mr. Scully did not complete all the work provided for in his contract, in that he failed to survey some 30 sections in townships 17 and 18 N., range 44 E. His default was clearly due to the conduct and instructions of the Land Office. He was knowingly permitted to proceed with his resurveys, retracements, and resubdivision in the belief that the Surveyor General would do all in his power to secure authorization from the Commissioner of the Land Office for work in excess of the $3,000 liability. After the limit was far exceeded, he was notified:

"That the instructions are explicit, and you will be justified in leaving those townships (townships 17 and 18, range 44 E.) unsurveyed. It is beyond my power to sanction or authorize anything not expressly provided for in the instructions, the circular of June 15, 1898, attached to and made part of your contract being considered ample authority to sustain any claim you may submit for extra work."

It is singular that the deputy's attention was not called to this fact in response to his repeated requests for instruction as to resurveys and retracements. This letter of the Surveyor General was written October 3, 1901. On the day before, the Commissioner had written the Surveyor General, directing his attention to Scully's letter relating to an excess of liability of $800, over and above the estimated liability of his contract, and advised that:

"Any action looking to the issue of special instructions providing for resurveys or retracements must be taken and approved prior to December 31, 1901."

Notwithstanding the Surveyor General's frequent promises of cooperation, there is no evidence that any effort was ever made to secure such an authorization from the Commissioner. The full significance of this will be better appreciated when we turn to page 223 of the Manual, and there learn that the deputy's account for such excess, unless it is accompanied by a copy of the office letter authorizing the same, will not be allowed.

Twice in March Scully asked instruction as to resurveys and retracements. This was after nine or ten days of preliminary investigation by the deputy, with his assistants, at his own expense, for the purpose of ascertaining exact conditions. April 24th Scully wrote the Surveyor General that all fractional subdivisions would have to be resubdivided. He said, "I do not see how under the rules I am to

avoid it," and asked advice. June 4th he writes the Surveyor General how he proposed to subdivide townships unless otherwise instructed. He dislikes the responsibility, hopes it is all right, and greatly wishes. instruction or suggestion about the subdivided portions of township 19, range 44 E., referred to 'in a previous letter. October 1st he writes:

"My notification that the cost would considerably exceed the estimate has. not yet been replied to."

He had already expended nearly $3,000 in cash. The money was borrowed. He was extremely uneasy at the prospect of expending more without authority. Then he added:

"I request in the most urgent manner that you will advise me by return. what to do until the decision of the G. L. O. in the matter is obtained. * * * I earnestly request that you will present my statement to the honorable Commissioner, and that you will advise me with as little delay as possible * * * what to do."

There is nothing to show that any effort had been or thereafter was. made to obtain such a decision of the General Land Office. Scully was advised by the Surveyor General's letter of April 4, 1901, that:

"Sufficient showing has been made to justify the resurvey of the entire township boundaries (of township 18, range 45), and to entitle you to compensation for so doing."

Relying upon this, Mr. Scully resurveyed the boundaries of that township, and on May 1, 1902, he was informed by the Surveyor General that the resurvey of 18 miles of that township boundary was unauthorized, and his failure to fully subdivide said townships 17 and 18 "was such a violation of both the language and spirit of the contract itself, as well as the established policy of the General Land Office, as to preclude the possibility of my approving your work, or of its being accepted by the honorable Commissioner."

After Mr. Scully's letter referred to above, in which he explained that under his construction of the rules in the Manual he did not see how he could avoid subdivision, no other reply was given than the statement that the Manual and other instructions already given were sufficient. It is clear that the Surveyor General's office was informed by the deputy in April, early in the progress of the survey, that he was resurveying certain interior and exterior lines, in the belief that he was authorized and required so to do by the Manual. To his request for advice and direction as to whether this was proper, the reply of the Surveyor General was:

"Your course is clearly pointed out in the circular of June 15, 1898. I appreciate your difficulties. I commend your conscientious work, and leave the details of executing your difficult task entirely to your own professional skill and judgment."

July 13th, the Surveyor General wrote, I "have no doubt but full compensation will be awarded you for the extra care and trouble bestowed upon your arduous work," and he adds that he would be pleased to recommend it. All this is flattering, but it is not specific.

It is not a "setting forth what the deputy is to do and how the work is to be performed."

It is impossible to believe that the Surveyor General's office intended, or that Scully understood from these letters, that his work was disapproved, or that no resurveys or retracements would be sanctioned or authorized save those expressly provided for in the circular of June 15, 1898. Under the circumstances, it was easy for Mr. Scully to believe that his construction of the Manual met with the approval of the Surveyor General, and it is difficult to understand how the Surveyor General could have anticipated anything but that Scully would resurvey the exterior and interior township lines, as he said he would in his letter, and that the field notes would contain the details of such surveys. It is difficult to understand why the deputy was not at least warned that his methods were improper, if that were the fact.

The default of the government contributed in a very large degree to Scully's failure to complete the surveys of townships 17 and 18 N., range 44 E., consequently Scully is not barred from recovery for what he did in accordance with the contract, even though the contract is entire. To hold otherwise is to hold that the government can take advantage of its own default. McElwee v. Bridgeport L. & I. Co., 54 Fed. 627, 629, 4 C. C. A. 525; Salmon v. Helena Box Co., 158 Fed. 300, 303, 85 C. C. A. 551; United States v. Behan, 110 U. S. 338, 4 Sup. Ct. 81, 28 L. Ed. 168; Thacke v. Hernsheim (Supp.) 115 N. Y. Supp. 216; Delafield v. Village of Westfield, 41 App. Div. 24, 58 N. Y. Supp. 277, 280.

### Refusal to Obey Instructions.

Complaint is made that Mr. Scully "preferred to use his own judgment as to what constituted work to be performed under the contract, rather than submit to the instructions and dictation of the department of the government which by the very terms of the contract he signed he agreed to do."

There is no evidence that Mr. Scully knowingly disobeyed, or refused to obey, any instructions whatever while he was engaged in the performance of his contract. On the other hand, there is abundant evidence of the fact that he again and again asked for instruction, which he did not receive.

### Opportunities to Correct Work.

The government says:

"It must be very evident from the persistent efforts made by the proper departmental officers to have petitioner expressly comply with the requirements of his contract that they were not intentionally endeavoring to deprive him of any rights to which he was legally entitled. Every opportunity was afforded petitioner to comply with the special instructions sent him, and the evidence shows that he persistently refused such compliance."

November 29, 1902, the Surveyor General advised Mr. Scully that it was impossible to continue office work on his field notes and sketch plats, further consideration of them being merely a waste of time,

and that, if he would come to Reno, every facility would be extended him for putting his notes and sketches into such shape that they could be properly worked up, and receive the approval of the office.

In a previous letter, written in May, the Surveyor General had assured Mr. Scully that his failure to fully subdivide a township, as distinctly specified in his contract, was such a violation, both of the language and the spirit of the contract itself, as well as the established policy of the General Land Office, as to preclude the possibility of approving his work, or of its being accepted by the Commissioner of the Land Office, and that serious departures from his special instructions and the directions of the Manual rendered his entire work open to rejection or suspension. July 8, 1903, after enumerating a number of serious errors in the survey, and calling attention to the unnecessary resurveys, the failure to complete the contract, the deputy's irregular and obscure methods, and his poorly prepared notes, he was given 30 days within which to signify his willingness to correct his surveys in the field, and to furnish field notes in proper form for acceptance. July 31, 1905, after specifying about 100 errors committed by Mr. Scully in the field, the Commissioner directed that Mr. Scully be allowed 30 days within which to signify his willingness to correct his surveys in the field, and furnish field notes in proper form for acceptance.

Compliance with any of these orders involved a reperformance of work which has subsequently been admitted to be correct. Consequently Mr. Scully's refusal was justifiable.

### Arrangement of the Field Notes.

If Mr. Scully has failed to arrange his notes in such manner as to meet the approval of the Surveyor General and the Commissioner of the Land Office, the fault, for the most part, lies very near the door of the Land Office itself. The maxim, "The king can do no wrong," has no application to the officials of that department. Having once made this contract, they were bound by it. They were no more at liberty to disregard its provisions than was Mr. Scully. True, Scully agreed to complete the surveys in conformity, among other things, with other surveying instructions issued by the Commissioner, and with such special instructions as he might receive from the Surveyor General. But the instructions referred to were instructions issued or received prior to or during the progress of the survey. It is unreasonable to construe the contract otherwise. To concede a retroactive efficiency and obligation to orders issued by the Commissioner subsequent to the performance of the work is to hold that these parties by agreement conferred on the Commissioner power to order proper work reperformed, and correct field notes rearranged again and again, by varying methods, and thus render execution of the contract so expensive as to be impossible.

Scully was not bound by the Manual of 1902, or by instructions issued to the Surveyor General of Montana in 1903. By the Manual of 1894 Scully was directed to incorporate his field notes of resurveys with the field notes of the subdivisions to which they relate. By the

Commissioner's own instructions of 1898, he was directed to incorporate his field notes of resurveys in a book by themselves. He followed the later order. He could not anticipate that the Manual of 1902 would reaffirm the rule of the Manual of 1894. Furthermore, the attention of the Land Office was called to his method of preparing and arranging field notes practically at the very beginning of that work in the letter of December 24, 1901, and by the specimen field notes of resurveys which accompanied that communication. Scully did all that could be expected to inform the Land Office as to his method and his construction of the Manual. No objection, no suggestion, and no instruction came. Believing, as he had a right to believe, that his course was satisfactory to the department, he labored thereafter two months on the notes, and completed them in February.

It is also charged that Scully has not placed field notes of the subdivisions of each township in a book by themselves; and notes of exteriors, base, and meridian lines in another book, as required by the Manual, p. 64, par. 13. Directions as to the preparation of field notes begin on page 60 of the Manual. The first 11 paragraphs clearly relate to the deputy surveyor. Section 12 requires him to send his notes to the Surveyor General. Section 13 requires the Surveyor General to prepare a certified transcript of the notes, and directs how it shall be done, and how it shall be arranged. Among other things, it requires field notes of base lines, standard parallels, principal and guide meridians, township exteriors, and division and meander lines, to be written in separate books, and field notes of subdivisions to be written in a separate book for each township.

Mr. Scully has failed to comply with these provisions. He contends they do not apply to deputy surveyors. The Land Office, takes the contrary view. The Commissioner of the Land Office says:

"Section 13, page 64, of the Manual of 1894, directs how transcripts of original field notes shall be prepared by the Surveyor General for the records of this office, and, therefore, as a condition precedent, he must require the same form in every particular from the deputy—in other words, sec. 13 (a) to (f) apply to the deputy as well as to your office."

It does not appear, however, that the Surveyor General ever expressly required this of Mr. Scully until long after the field notes were completed. The strong argument against the Commissioner's interpretation of paragraph 13 is that it would have been exceedingly easy to extend its directions to deputy surveyors as well as to Surveyors General by express, unmistakable terms, if the Land Office had so intended. That it was not done is significant. A more important consideration is the fact the Land Office knew in December, 1901, when Mr. Scully was practically at the beginning of the work on his notes, how he interpreted paragraph 13. He was permitted to proceed with his work without a suggestion, having good reason to believe that his construction of the rule was satisfactory. It was only after his work of months had been completed that he was informed he had not segregated his notes properly, and had included therein field notes for 158½ miles of unauthorized resurveys and retracements. There

has been no attempt, either in the answer or the evidence, to deny this previous knowledge on the part of the Land Office, or to explain the failure to give Mr. Scully the information and direction, which, under the circumstances, should have been given.

[5] It is a well-established principle that, when there is a doubt as to the meaning of a contract, a party will be held to that meaning which he knew the other party supposed the words to bear. Brent v. Chas. H. Lilly Co. (C. C.) 174 Fed. 877, 881; Allen-West Com. Co. v. Patillo, 90 Fed. 628, 33 C. C. A. 194; 2 Page on Contracts, § 1127.

In Central Pac. Ry. Co. v. United States, 28 Ct. Cl. 427, it is said:

"A construction given to a contract by the express declaration of one party and the silent acquiescence of the other, prior to and during the performance of a service, cannot be repudiated after a party has acted upon the faith of it."

[6] Again, the Manual and the instructions of the Commissioner, which are made a part of the contract, as well as the contract itself, were prepared by the Land Office. The rule that a contract is to be construed most strongly against the party preparing it applies to the government in a case like this, as well as to an individual. Garrison v. United States, 7 Wall. 688, 690, 19 L. Ed. 277; United States v. Newport News Shipbuilding & D. D. Co., 178 Fed. 194, 200, 101 C. C. A. 514; Simpson v. United States, 31 Ct. Cl. 217, 243. It would be manifestly unjust to hold with the Commissioner and the Surveyor General that Scully violated his contract by arranging his notes in accordance with the Commissioner's instructions of June 15, 1898, or because he followed his own interpretation of said section 13, after the Land Office had notice and abundant opportunity to set him right, and failed to do so.

It is alleged that the field notes are unintelligible, ambiguous, and confusing. In support of this the Commissioner in the last paragraph of his letter, attached to the answer, refers to two extracts from the notes, one quoted at page 49 (45), and the other at page 51 (46) of the letter. Examination shows the extracts have lost nothing of incomprehensibility in being transferred from the original field notes to the Commissioner's decision.

On pages 45 and 46 (49) of the decision there is a quotation of 56 lines. In the process of transcription the text has lost 17 punctuation marks and 2 words, 3 words have been misplaced, 5 new words have been added, and in 6 instances a different word has been substituted for the one used by Mr. Scully.

On pages 46 and 47 (51) of the decision there is a quotation of 40 lines. The copyist has omitted 15 punctuation marks and 3 words used by Mr. Scully, and in four places substituted his own word for the word used in the original notes.

On pages 41 and 42 there is a description in 42 lines of the parallel line run by the deputy to find the west boundary of township 18 N., range 45 E. This extract the Commissioner pronounces incomprehensible. Comparing it with the original text on page 58, book I of the field notes, it appears that 7 paragraphs used by Mr. Scully have been

compressed into 4; 18 punctuation points have been omitted, and a word changed.

On page (49) we find the following:

"Chains:

"80.30    Intersect E. bdry of T. 19 N. R 45 E. N. 89°18' W. 4.02 chs. from
          S. E. Tp. cor (compare 3 miles S. Easting of point on Meridian
          line 40.4¼ minutes difference in azimuth)."

The Commissioner asks "What does this mean?" From the quotation it appears that the deputy going north on the east boundary of the township bisects the east boundary of the township to the north. This, of course, is absurd. Referring to the original text, on page 88, book I of Mr. Scully's field notes, we find the following:

"80.30.    Intersect S. bdy of T 19 N. R 45 E N 89°18' W. 4.02 chs. from
           S E Tship Cor (Compare 3 miles S. Easting of point on Meridian
           line 404¼ minute difference in azimuth)."

On page 8, line 1, of the decision, is this quotation:

"80.00    Ascending 1.00 cor found set mound of rock to make line 15 lks. E.
          (What does this mean?)."

Turning to page 315, book C, resurveys of section boundaries, township 14 N., range 41 E., we find:

"80.00    Ascending no cor found – set mound of rock to mark line 15 lks. E."

After such mutilation, it is not at all surprising that Mr. Scully's notes are somewhat difficult to understand.

It is impossible to assume the errors of the copyist were intentional; but the fact that the honorable Commissioner in a matter so important to Mr. Scully could have used these quotations from the field notes without verification is perplexing. If such inaccuracy is exceptional in the Land Office, it should be explained; if not exceptional, why is Mr. Scully's work condemned with so much severity?

## The Commissioner's Decision is Not Conclusive.

(1) The Commissioner in his decision of January 17, 1905, found more than 100 defects in the survey. He failed to take into consideration the now admitted fact that the survey was reasonably well executed, and the government has no complaint to make in relation to the work in the field.

(2) He found that Scully had not completed the subdivision of townships 17 and 18 N., range 44 E. He failed to take into consideration the undisputed fact that the Surveyor General wrote Mr. Scully October 3, 1901, that he would be justified in leaving those townships unsurveyed because the estimated amount of his contract had been exceeded.

(3) He found that Scully's resurveys, retracements, and resubdivisions being greatly in excess of any authorization, the notes thereof should be eliminated. He failed to take into consideration the fact that Scully during the whole of his work in the field was vainly asking instruction as to this extra work, and an authorization therefor, and that the Land Office as early as April, 1901, was informed that he

was making these retracements and resurveys. It was impossible to assume that field notes of such retracements would not be included by the deputy in his report. Nevertheless, with knowledge of these conditions, the Land Office failed to warn Mr. Scully, and permitted him to continue this extra work in the belief that an effort would be made by the Surveyor General to secure compensation therefor.

(4) He found that Scully had improperly arranged and segregated his field notes, but failed to take into consideration the fact that Scully early in the preparation of his notes submitted specimens thereof, with a letter directing attention to and exhibiting his method of arrangement, that no objection was made, and the Land Office knowingly permitted Mr. Scully to complete his notes in the belief that they were satisfactory to the Department.

(5) The Commissioner found that Mr. Scully's field notes were obscure and unintelligible. The quotations from said notes on which this finding is apparently based were incorrectly transcribed. A decision in which so many important and vital considerations are ignored cannot be treated as conclusive.

### Survey for Private Parties.

The Commissioner, at page 24, line 24, of the decision of January 17, 1905, in speaking of the surveys made in township 17 N., range 44 E., says:

"The resurvey appears to have been made for private individuals for which this office cannot assume responsibility."

In other words, the deputy has surveyed for private individuals, and charged the expense to the government. This is a serious charge. It should not be made unless susceptible of proof. The only testimony I have found on this subject, or which has been called to my attention, is Mr. Scully's letter to the Surveyor General, dated February 25, 1905, in which he states that this resurveyed land "is barren and waterless, and will not be bought for generations to come."

After Mr. Scully's letter of explanation, it is strange this charge should have been incorporated in the answer without explanation, unless the government knew that it could be proven.

It is possible the rates allowed for the work are inadequate, but they are the rates fixed by the contract itself, and the court is powerless to change them. A court of equity cannot relieve against such a contract simply because the deputy signed it without knowledge of the unusual and peculiar difficulties of the work. There is no showing that the officers of the Land Department or the government fraudulently concealed from him any fact which should have been disclosed, or that he did not have ample opportunity to investigate the situation before signing the contract. The contract appears to be a correct expression of precisely what the parties agreed to.

The testimony shows that petitioner performed more than $3,000 worth of work under the terms of his contract. Three thousand dollars was the liability fixed. The Manual provides (page 223) that:

"When the amount of an account is in excess of the liability of the contract, a copy of office letter authorizing the excess must always accompany the account."

Mr. Scully never received a letter from the Commissioner authorizing any excess. His account is for $5,189.85. Whatever he did above $3,000 without authorization, notwithstanding the letters received from the Surveyor General, was voluntary on his part, and he can be allowed no compensation therefor.

[7] The $3,000 should have been paid within a reasonable time after the field notes and plats were filed in the Surveyor General's office. There was an unreasonable delay during which interest has accumulated on the money borrowed by Scully to pay the wages of his employés who assisted in making the survey. No judgment for interest can be rendered against the government, however, in a case like this, unless interest has been provided for either in the contract or by statute. My attention has been called to no provision of the law authorizing such award. Section 1091, Rev. Stats. U. S. (U. S. Comp. St. 1901, p. 747) page 73, vol. 2, Fed. Stats. Ann.; Carlisle v. Cooper, 64 Fed. 472, 12 C. C. A. 235; Pennell v. United States (D. C.) 162 Fed. 75; United States v. Sargent, 162 Fed. 81, 89 C. C. A. 81; United States v. Barber, 74 Fed. 483, 20 C. C. A. 616.

(1) I find the survey in question was reasonably well executed by Mr. Scully.

(2) Inasmuch as no defects have been pleaded or called to my attention, I find the plats have been properly prepared by the deputy.

(3) The failure to subdivide portions of townships 17 and 18 N., range 44 E., was caused by advice and direction of the Surveyor General, and by the failure of the government to properly instruct Scully as to resurveys and retracements.

(4) The inclusion of field notes of excessive resurveys, retracements, and resubdivision lines was due in large part to letters from the Surveyor General's office, from which the deputy could reasonably infer his course was approved, and that every effort would be made to secure proper authorization by the Commissioner for such resurveys and retracements.

(5) The failure of the deputy to incorporate field notes of retracements and resurveys with the field notes of the subdivisions to which they are directly related, as required by the Manual of 1894, was due to the Commissioner's instructions in the circular of June 15, 1898, in which the deputy was directed to place such notes in a book by themselves.

(6) The deputy included his field notes of subdivisions in the same book with the field notes of base lines of township exteriors, etc., but in separate portions of the same book, and in a separate book for each township. He did this in the belief that section 13, p. 64, of the Manual, had no application to deputy surveyors. The attention of the Surveyor General was seasonably directed to this arrangement, and no objection or suggestion was offered by the Land Office until long after the notes were completed.

(7) The field notes, though written in a small cramped hand, and in places not easily understood by one without technical knowledge, are reasonably accurate, and comply with the provisions of the contract.

(8) The Land Office failed to afford instructions demanded, and needed by the deputy in the performance of his contract, as required by the Manual. This constituted the first breach of the contract.

(9) I find that the work performed by Scully in strict compliance with the conditions of the contract and at the rates provided therein amounted to more than $3,000, and was reasonably worth more than $3,000.

Let judgment be entered in favor of the plaintiff for the sum of $3,000.